

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HYDRA-STOP, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 03 C 4843 |
| | ) | |
| SEVERN TRENT ENVIRONMENTAL | ) | |
| SERVICES, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

CHARLES P. KOCORAS, Chief District Judge:

This matter comes before the court on five motions of the parties. Three are motions for partial summary judgment, which as a whole address all of the counts of the complaint and counterclaim filed in this case. The remaining two motions seek to strike expert testimony. For the following reasons, one motion for summary judgment is granted. The other two are granted in part and denied in part. The motions to strike are denied without prejudice.

## BACKGROUND

Plaintiff Kevin Murphy is the president and principal shareholder of Plaintiffs Hydra-Stop, Inc., and HSI Services, Inc. He is the manager of Plaintiff Asylum Partners, LLC. For the sake of convenience, we will refer to Plaintiffs collectively as "Murphy."

Defendant Severn Trent PLC is the parent corporation of Defendants Severn Trent Environmental Services ("Environmental") and Capital Controls, Ltd.

The dispute in this case arises out of an Asset Purchase Agreement ("APA") executed on May 31, 2000, between Hydra-Stop and Defendants Pitometer Associates, Inc., and Capital Controls Limited ("Capital"). Because Environmental is the successor in interest to Defendant Pitometer Associates, Inc., with respect to the APA, we will refer to them both as "Environmental." Pursuant to the agreement, Capital purchased the assets of Hydra Stop, Ltd., and Environmental purchased the assets of Hydra-Stop, Inc.; HSI Services, Inc.; HSI Trucking, Inc.; and HSI Network Sciences, Inc. for $11,750,000.

The purchase price included inventory owned by Hydra-Stop, Inc., estimated to be worth $310,000 at the time the agreement was executed. The agreement acknowledged that the actual value of the inventory was not known as of the date of execution. Section 2.9 of the APA provided that, within five days of the execution of the agreement, the parties would physically count all of the inventory included in the asset purchase. It further stated that if the count revealed that the inventory was worth more than $310,000, the purchase price would be increased to include the difference between the estimated and actual inventory values. If, on the other hand, the inventory proved to be worth less than $310,000, Murphy would refund the difference to Environmental. If

the count revealed that the estimate was more than the actual value, Murphy could challenge the calculated value through a specified process.

Environmental hired Les Detterbeck, Murphy's accountant, to perform the postclosing inventory count and valuation. Detterbeck's efforts yielded a value of $1,524,315.55, and Murphy subsequently demanded that Environmental pay him the $1.2 million difference between that figure and the $310,000 identified in § 2.9. Environmental disputed the accuracy of Detterbeck's conclusions and performed several inventory counts and valuations of its own. To date, Environmental has not paid any money for the inventory above the $310,000.

Another provision of the APA stated that Murphy would stay on at Hydra-Stop as a consultant for three years after the sale was executed. He was paid an annual salary of $250,000 and was given the possibility of receiving earnout payments if the company's gross profits (calculated using a formula enumerated within the agreement) exceeded certain levels over the first three years after closing. The payouts were capped at $5,000,000 in the aggregate.

Section 2.3(d)(vi) of the APA specified that, while Murphy served as a consultant, he would have the same control and authority of a chief executive officer. He reported to the president of Environmental, a position occupied at that time by a Bill Hall. In the fall of 2000, Environmental hired John Marafino as vice-president of operations to

oversee the day-to-day functioning of the company. Marafino reported to both Murphy and Hall. Environmental made several other changes in areas from employees to branding to advertising.

During Murphy's three years as a consultant, the company's profits declined, though it still operated at a profit. The relationship between the parties steadily deteriorated, and several disputes erupted over particular payments by customers or other actions taken. Shortly after his consultancy expired, Murphy filed the instant suit. His complaint alleged that Environmental owed him approximately $1,214,315.55 for the inventory payment, that they had deliberately suppressed profits to prevent him from receiving any earnout payments, and that they had defrauded him in connection with the value of the inventory and their plans for the company both individually and in concert with Capital. The complaint also implicated PLC in each of these counts, as well as alleging in the final count that PLC was the true moving force behind Environmental's actions and therefore that it had tortiously induced Environmental to shirk its contractual obligations to Murphy. PLC moved to dismiss the complaint as to it on grounds that personal jurisdiction was lacking. We granted the motion with respect to the first three counts but denied it as to the tortious interference claim. Hydra-Stop, Inc. v. Severn Trent Environmental Servs., Inc., 2003 WL 22872137 (N.D. Ill. Dec. 3, 2003).

In conjunction with the filing of their answer, Environmental filed a four-part counterclaim. It alleged that Murphy breached the APA and defrauded Environmental by supplying financial statements, particularly for the year 1999, that were not prepared according to generally accepted accounting principles ("GAAP"). It also contended that Murphy had converted two specific customer payments that belonged to Environmental: one from a customer called CPI and another from Logan Utara. Finally, the counterclaim alleged that Murphy owed Environmental certain amounts that he was to pay them under the APA. The parties proceeded to discovery on the remaining counts of the complaint and counterclaim, a process which included retention of experts Terry Korn, Garry Bartecki, Sally Hoffman, and Alan Funk on issues tied to the inventory valuation and the potential for earnout payments.

PLC now moves for summary judgment in its favor with respect to the sole remaining count against it. Murphy and Environmental each move to strike the expert testimony proffered by its opponent and for summary judgment with respect to certain portions of the complaint or counterclaim, some of which overlap into cross motions.

## LEGAL STANDARDS

### A. Cross Motions for Summary Judgment

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ.

Proc. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). In seeking a grant of summary judgment the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. Proc. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." Celotex, 477 U.S. at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. Proc. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); rather, "[a] genuine issue exists when the evidence is such that a reasonable jury could find for the non-movant," Buscaglia v. United States, 25 F.3d 530, 534 (7th Cir. 1994). When reviewing the record we must draw all reasonable inferences in favor of the non-movant; however, "we are not required to draw every conceivable inference from the record–only those inferences that are reasonable." Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir. 1991).

When parties file cross motions for summary judgment, each motion must be assessed independently, and denial of one does not necessitate the grant of the other. M. Snower & Co. v. United States, 140 F.2d 367, 369 (7th Cir. 1944). Rather, each motion evidences only that the movant believes it is entitled to judgment as a matter of law on the issues within its motion and that trial is the appropriate course of action if the court disagrees with that assessment. Miller v. LeSea Broadcasting, Inc., 87 F.3d 224, 230 (7th Cir. 1996).

## B. Motions to Strike Expert Testimony

Federal Rule of Evidence 702 only permits expert testimony that "will assist the trier of fact to understand the evidence or to determine a fact in issue." An expert may so testify "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Id. Pursuant to these requirements, "a district court judge is to act as a 'gatekeeper' for expert testimony, only admitting such testimony after receiving satisfactory evidence of its reliability." Dhillon v. Crown Controls Corp., 269 F.3d 865, 869 (7th Cir. 2001).

With these principles in mind, we turn to the parties' motions.

## DISCUSSION

### A. Motions to Strike Expert Testimony

Both Environmental and Murphy move to strike the testimony of experts proffered by their opponents. Each contends that the evidence advanced does not satisfy the standards required under Fed. R. Evid. 702 as explained in <u>Daubert v. Merrill Dow Pharmaceuticals</u>, 509 U.S. 579, 113 S. Ct. 2786 (1993), and its progeny.

Each expert submitted a report as well as giving deposition testimony. With respect to the opinions offered within the reports, the parties ignore a threshold infirmity that obviates any consideration of the soundness of the methodology these experts employed: none is accompanied by a sworn affidavit attesting to the authenticity of the document. Without this foundational support, the reports cannot be offered as evidence in connection with a motion for summary judgment. <u>See</u>, <u>e.g.</u>, <u>Scott v. Edinburg</u>, 346 F.3d 752, 759 (7th Cir. 2003). Consequently, we consider only the deposition testimony of the four experts.

Murphy's experts, Alan Funk and Garry Bartecki, opine on both the correctness of the $1.5 million inventory value as well as the potential Murphy had for gaining earnout payments. The deposition excerpts that the parties have offered, while acknowledging certain general aspects of the processes employed by Bartecki and Funk, do not provide sufficient explanation or detail to allow us to definitively exclude them

for all purposes. Without more, we cannot determine whether Environmental's position that their testimony should be stricken is meritorious or not. As a result, the motion to strike the testimony of these expert witnesses is presently denied.

Environmental's expert, Sally Hoffman, restricts her analysis to whether Environmental was damaged by receiving inventory valued in excess of the $310,000 indicated in Hydra-Stop's financial statements. Their other expert, Terry Korn, offers opinions on Murphy's potential for gaining earnout payments. In their depositions, each sets forth descriptions of and insight into the methodologies they employed in forming their opinions to allow us to conclude that the Daubert standard is satisfied. Some of the challenges to these experts require greater elucidation and development, as well as an opportunity to supply additional matters of justification. As a consequence, the motions to strike are presently denied without prejudice.

## B. Severn Trent PLC's Motion for Summary Judgment

After our ruling on PLC's motion to dismiss for lack of personal jurisdiction, only one count of Murphy's complaint remained with respect to PLC. That count alleges that PLC tortiously interfered with the contractual relations between Murphy and Environmental by inducing Environmental 1) to withhold the inventory payment from Murphy and 2) to prevent the company from reaching the profit thresholds necessary for him to receive earnout payments. PLC moves for summary judgment in its favor on this

count, arguing that Murphy can show no evidence that they were actively involved in charting the course that Environmental took under the APA.[1]

To prevail on his claim of tortious interference, Murphy must show that he had a valid contract with Environmental, that PLC was aware of the contract, that it intentionally and unjustifiably induced Environmental to breach its contractual obligations, that PLC's actions caused the breach to occur, and that Murphy suffered damages from the breach. See Belden Corp. v. InterNorth, Inc., 413 N.E.2d 98, 101 (Ill. App. Ct. 1980). There is no dispute that the APA was a valid contract or that PLC was aware of its existence. With respect to the respect to the third and fourth elements, PLC contends and advances evidence to support that it was neither informed of nor involved in Environmental's decision making process with respect to the APA and Environmental's performance under the agreement. There is undisputed testimony that Len Graziano, an executive at Environmental, decided that Murphy would not be paid any additional money for the inventory received without input from anyone at PLC. The evidence shows only passing mention of issues between Murphy and Environmental at

---

[1] In his response, Murphy asks that we reinstate the dismissed claims, but he has not presented this request in a procedurally correct manner. Furthermore, even if he had properly moved for reconsideration of our ruling, he has offered no persuasive reason why our earlier conclusions were in error. We therefore confine our analysis to the only claim for which we have the power to pass judgment: the tortious interference claim advanced in Count IV.

PLC meetings, and there is no evidence that PLC had any input into the operations of Hydra-Stop that would affect its profitability during Murphy's consultancy.

The evidence Murphy has presented to defeat the motion is not to the contrary. At best, these facts upon which he relies establish passive, generalized knowledge of events that transpired, but nothing that rises to the level of intentional and unjustified action by PLC designed to effect unlawful behavior by its subsidiary. As a result, Murphy has shown nothing to support his theory that PLC engaged in purposeful acts that could be said to have caused any unlawful acts by Environmental. Because Murphy has failed to demonstrate any evidence of an issue needing trial, PLC's motion for summary judgment in its favor on Count IV of Murphy's complaint is granted.

## C. Murphy's Motion for Summary Judgment

With respect to his complaint, Murphy moves for summary judgment on a single, discrete aspect: his claim that Environmental is contractually obligated under § 2.9 to pay him an adjustment (and the interest that has accrued on that amount since the dispute first arose) for the additional inventory. With respect to Environmental's counterclaim, he requests a judgment in his favor as to all four counts. We address each argument in turn.

### 1. Count IA/Counterclaim I: Inventory Adjustment

Murphy's argument that he is entitled to an inventory adjustment is rooted in the plain language of § 2.9 of the APA, which states in pertinent part:

Within five days after the Closing Date, Buyer and Sellers shall jointly conduct a physical count of all of Sellers' inventories counting for such purposes only those items of Sellers' inventory that are in usable and saleable condition at retail . . . If and to the extent that the aggregate value of all of the inventory of the US Sellers as so determined is more than $310,000 . . . the Base Purchase Price payable by Buyer to Sellers hereunder shall be adjusted and increased by the amount of such overages.

The parties' arguments with respect to this issue focus on whether Environmental can challenge Detterbeck's conclusions, not whether they are obligated to pay an adjustment to Murphy if the inventory is valued above $310,000. It is not disputed that the inventory Hydra-Stop had at the time of closing was worth more than that amount. Neither is it disputed that Environmental has not paid Murphy anything beyond the $310,000 for the inventory. Based on the plain language quoted above, we conclude that Environmental's failure to pay more than $310,000 is a breach of their obligations under the APA.

Having established that Environmental has breached the APA, we turn to the parties' true fight: the amount of damages. Murphy urges that he is owed the $1,214,315.55 difference between Detterbeck's final valuation and the $310,000 figure in the APA. Environmental challenges the correctness of this figure in two ways: first, by contending that Detterbeck's valuation contained several errors, as described by their expert Sally Hoffman,[2] and second, by contending that Murphy's failure to supply them

---

[2] Hoffman's challenges to Detterbeck's results are primarily contained in her (continued...)

with GAAP-compliant financial statements before the closing as required by § 3.1 of the APA releases them from their contractual obligation to pay any overage.

With respect to the first argument, the undisputed fact is that Environmental retained Detterbeck to perform the count provided for under the APA. Detterbeck had the power to act on their behalf in performing the count and valuation of the inventory; their relationship was that of agent and principal. See Letsos v. Century 21, 675 N.E.2d 217, 224 (Ill. App. Ct. 1996). If Environmental was displeased with Detterbeck's work as their agent, it was incumbent upon them to raise the issue within that relationship at that time. Because they did not, their agreement now with his final product is irrelevant. The end result of his retention was a document memorializing his conclusion that the existing Hydra-Stop inventory was worth $1,524,315.88 as of May 31, 2000. While we do not subscribe to the idea that Environmental was never without recourse if they disagreed with the outcome of the joint count, their time to do so has long since come and gone and the arena in which that dispute should have played out is not this suit.

---

[2] (...continued)
report and rebuttal report, which as described above cannot be considered as evidence for purposes of this motion. However, Hoffman also described the deficiencies she found during her deposition, the contents of which are fair game. Nevertheless, her testimony, even if given full evidentiary weight, does not and cannot create a material issue of fact either as to Environmental's liability for the unpaid inventory evaluation or the amount of same.

Environmental is bound by the figure reached by its agent Detterbeck, regardless of any alleged deficiencies its expert identified in the context of this case.

With respect to Environmental's second argument (which also forms the basis of the second point in Murphy's motion), we disagree that the financial statements, GAAP-compliant or not, have the potential to release Environmental from its obligation to pay an increased purchase price for the additional inventory. Murphy argues that the resolution of this issue turns on whether §§ 2.9 and 3.1 conflict and that, in any event, Environmental cannot show that the statements did not comply with GAAP. Environmental insists that there is no conflict between the two provisions and goes on to argue that Murphy has in essence admitted that he did not fulfill his obligations under § 3.1.

These battles overlook a fundamental fact. The APA is a fully integrated contract, executed by two sophisticated parties represented by experienced counsel. There is nothing in the language of § 2.9 that indicates the $310,000 figure is in any way tied to the financial statements or their accuracy. The section specifies that figure as what was included in the base purchase price and then establishes a corrective process once the value of the inventory can be determined. If Environmental wished to link that number to the accuracy of the financial statements, they should have done so. As the contract

stands, there is no connection between the obligations set forth in the two sections, so a breach of one does not affect what must be done under the other.

In sum, the APA provided that Environmental would pay the difference between the $310,000 and the valuation produced by the joint count if the latter was in excess of the former. Because that situation has come to pass, Environmental is liable to Murphy for the $1,214,315.55 difference as well as interest that has accrued while this amount has gone unpaid, pursuant to § 2.9.

## 2. Counterclaim II: Fraud

Next, Murphy moves for summary judgment of nonliability for the second cause of action contained in the counterclaim. This claim alleges that Murphy made material misrepresentations to Environmental in the form of the financial statements provided before the closing. Environmental contends that they reasonably relied on these statements and suffered damages in the amount of the difference between the estimated value of the inventory and the actual value. If Environmental could show each of these elements, they could proceed under a fraud theory. See Chatham Surgicore, Ltd. v. Health Care Serv. Corp., 826 N.E.2d 970, 977 (Ill. App. Ct. 2005).

However, Environmental cannot establish that they reasonably relied on the representations of the financial statements to come to the conclusion that they would pay no more than $310,000 for Hydra-Stop's inventory. The undisputed evidence shows that

Environmental had been told that the figures given were estimates and that the inventory had not been counted for 18 months, and they knew that the statements were not audited. Furthermore, their preclosing due diligence report was replete with warnings about the unreliability of these documents and recommendations for actions to obtain more accurate information.

The law requires that we consider all of what Environmental knew about the transaction to determine whether their professed reliance was reasonable. See Luciano v. Bestor, 436 N.E.2d 251, 256-57 (Ill. App. Ct. 1982). When all of the information known or available to Environmental is considered as a whole, we do not agree that they were justified in believing the representations made within the unaudited statements to the exclusion of everything else they knew about, even in the face of the warranty given in § 3.1(e)(ii).

The case Environmental cites in support of their argument that the warranty cancels out all else is not to the contrary. In fact, the text upon which they rely addresses only the impact of an express warranty on a breach of contract claim. Vigortone AG Products, Inc. v. PM AG Products, Inc., 316 F.3d 641, 648-49 (7th Cir. 2002). Environmental fails to acknowledge that Vigortone also involved a fraud claim. The appellate court reversed the jury's verdict in favor of the allegedly defrauded party and awarded judgment as a matter of law in favor of the alleged defrauder because of the lack

of justifiable reliance upon a particular representation in light of several contrary pieces of information known to the party at the time of the alleged fraud despite the existence of a warranty in the agreement. Id. at 645-47.

Because Environmental has not shown any evidence that would allow a finder of fact to conclude that they reasonably relied on the information contained in Hydra-Stop's financial statements, Murphy is entitled to summary judgment on the fraud count of Environmental's counterclaim.

*3. Counterclaim III: Conversion*

Next, Murphy moves for summary judgment on Environmental's claim that he converted two payments from two customers, CPI and Logan Utara, for work that was performed around the time that the company changed hands. The APA specifies that Murphy would be paid for work completed before the sale, and Environmental would be paid for work completed after the sale.

To prevail on its claim for conversion, Environmental must show four things: first, that Murphy exercised unauthorized or wrongful control, dominion, or ownership of the payments from Logan Utara and CPI; second, that Environmental had a right to the payments at all relevant times; third, that Environmental had a right to immediate possession of the payments; and fourth, that Environmental demanded that Murphy turn over the payments to them. See Cirrincione v. Johnson, 703 N.E.2d 67, 70 (Ill. 1998).

Murphy contends that Environmental comes up short with respect to all but the fourth element. His challenge is both factual and legal in nature. First, he contends that there is no dispute that the work was completed before the sale. Second, he argues that Environmental's claim does not properly sound in conversion. In support of the latter argument, Murphy cites In re Thebus, 483 N.E.2d 1258, 1260-62 (Ill. 1985) and Horbach v. Kaczmarek, 288 F.3d 969, 975 (7th Cir. 2002).

We disagree with Murphy on both points. First, there is a legitimate dispute whether the CPI and Logan Utara work was completed before the sale, as Detterbeck listed them as "works in progress" in the postclosing inventory count and valuation. If the jobs were not completed as of the closing date, the eventual payments would belong to Environmental, not Murphy. Second, though an unspecified amount of money cannot be the "property" underlying a claim of conversion, a specific and identifiable amount, particularly when it is identifiable because it originates from an outside source, can be tortiously converted. See Bill Marek's The Competitive Edge, Inc. v. Mickelson Group, Inc., 806 N.E.2d 280, 286, 288 (Ill. App. Ct. 2004). Environmental has produced sufficient evidence with regard to both of these issues to defeat Murphy's motion for summary judgment on this count.

*4. Counterclaim IV: Breach of Contract for Failure to Pay "Due from Seller" Sums*

The last target of Murphy's motion is Counterclaim IV, in which Environmental contends that Murphy breached the APA by failing to pay certain amounts due to

Environmental after the closing. Murphy urges that there is no dispute that he has paid all amounts due. In part, this argument is based on his contention that the parties reached an accord and satisfaction, which impliedly admits that he has not paid everything that Environmental informed him he owed.

Our ability to fully assess the parties' respective positions is hampered by citations within the statements of fact to exhibits that do not correspond to the documents referenced within the statements. However, from the evidence that is properly presented, it is apparent that the facts surrounding this cause of action are very much in dispute, so no summary disposition is appropriate at this time. Thus, Murphy's motion is denied with respect to Counterclaim IV.

## D. Environmental's Motion for Summary Judgment

Environmental's motion for summary judgment addresses the three counts of Murphy's complaint directed to them as well as two counts of their counterclaim. Because we have addressed the merits of the arguments with respect to Count IA of the complaint and Counterclaims I and II in the context of Murphy's motion, we will not revisit them.

### 1. Count IB: The Earnout Provision

The first portion of Environmental's motion that remains pertains to Murphy's allegation that Environmental breached § 2.3 of the APA, the so-called earnout

provision, which states that Murphy will be paid a specified percentage of Hydra-Stop's profits if the company's overall profit levels exceed certain thresholds during the three years of his consultancy.

It is undisputed that the company did not surpass the necessary profit levels. Neither is it disputed that Murphy did not receive any earnout payments. Murphy's theory of liability is that the company would have reached the levels specified if he had been allowed to run the company as he saw fit. He contends that Environmental made certain decisions regarding the chain of command within the company (particularly hiring Marafino as vice president of operations), branding, and use of Hydra-Stop employees that hamstrung the company into earning profits below the thresholds required for him to garner additional payments under the earnout provisions of § 2.3 of the APA.

In response, Environmental points out that the contract provided that Murphy was not the ultimate decision maker but instead was subject to the supervision of Environmental and its board of directors. Environmental was entitled to make decisions about the company's operations as it saw fit, regardless of whether Murphy ultimately agreed with them, so it breached no contractual duty in making decisions contrary to what Murphy would have done. Moreover, both of Murphy's experts acknowledged that there is no way to quantify the impact of the various decisions Environmental made.

Funk Tr., pp. 69-70, Bartecki Tr., pp. 214-16. As a result, any argument that Murphy would have received earnouts if Environmental had not pursued the paths with which Murphy disagreed would be pure speculation. Such musings cannot be the basis of a claim for legal damages.

Because Murphy cannot show that Environmental took any action not allowed under § 2.3 and because it is not possible to show Hydra-Stop would have achieved the profit thresholds but for Environmental's decisions, Environmental is entitled to summary judgment on Count IB of Murphy's complaint.

*2. Count II: Fraud*

The penultimate issue for our consideration is Environmental's motion for summary judgment on Murphy's fraud claims. As explained in the context of Environmental's fraud claim, to defeat the motion for summary judgment, Murphy must show that Environmental made a representation of material fact about the value of the inventory, knowing or believing that it was untrue, to induce Murphy to act or refrain from acting. See Chatham Surgicore, 826 N.E.2d at 977. Murphy must demonstrate that he reasonably relied upon the truth of the misrepresentation, which in turn caused him injury. Id.

As is apparent from even the limited recital of the parties' interactions in this opinion, Murphy cannot show that he ever relied on the information Environmental

offered with respect to the value of the inventory. The undisputed evidence is that he never budged from his position that he was owed the $1,214,315.55.

Moreover, the actions Murphy claims were taken to his detriment in reliance are not of the kind that would lead to recoverable damages. He contends that Environmental's alleged fraud caused him to continue his consultancy under "difficult circumstances," incurring unidentified expenses, and then pursuing resolution of the disputes in his favor both privately and before this court. These contentions undermine Murphy's claim rather than supporting it. First of all, the "difficult circumstances" to which he points were the direct result of his constant belief that he should be receiving more money from Environmental. Second, an offhand reference to unspecified expenses is nowhere near sufficient to stave off summary judgment on an issue of damages incurred. Lastly, to support his claim for fraud, Murphy must show that he took action because he believed Environmental was telling him the truth, not that his disagreement with their position led him to take steps to prove that his contrary position was in fact correct. In short, Murphy cannot show any reliance on Environmental's statements about the value of the inventory or that he suffered any damage from the same.

With regard to the allegations of fraud ultimately leading to Murphy being unable to receive earnout payments, the same unavoidable speculative nature of Environmental's actions on Hydra-Stop's ultimate profit achievements that impeded

Murphy's contract claim dooms his fraud claim. Furthermore, the idea that Murphy would have received earnout payments but for statements that Environmental made during the contract negotiations is entirely too attenuated a theory of causation to allow a factfinder to reach a conclusion in Murphy's favor. Environmental is entitled to summary judgment on Count II of Murphy's complaint.

### 3. Count III: Conspiracy to Commit Fraud

Finally, we examine Environmental's challenge to Count III of the complaint, which alleges that Environmental, Capital Controls, and PLC all conspired to defraud Murphy in the manner described in Count II. However, as stated above, Murphy cannot show that he relied to his detriment on any of the alleged misrepresentations or that he suffered any cognizable damages even if he had relied. Without an underlying fraud, there cannot be a conspiracy to commit the same. Accordingly, Count III cannot stand as to any of the alleged conspirators.

## CONCLUSION

Based on the foregoing, PLC's motion for summary judgment is granted. Murphy's motion for summary judgment is granted with respect to Count IA of the complaint and Counterclaims I and II. It is denied with respect to Counterclaims III and IV. Environmental's motion is granted with respect to Counts IB, II, and III of Murphy's complaint. It is denied with respect to Count IA of Murphy's complaint and

Counterclaims I and II. The motions to strike the testimony of Garry Bartecki, Alan

Funk, Sally Hoffman, and Terry Korn are denied as described.


Charles P. Kocoras
Chief Judge
United States District Court

Dated: AUG 1 9 2005